UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11 CR 246 CDP |
| | ) | |
| DOMINIC HENLEY (4), | ) | |
| | ) | |
| Defendant. | ) | |

# FINDINGS OF FACT, CONCLUSIONS OF LAW, and SENTENCING OPINION

At the April 15, 2013 sentencing hearing, I imposed a 204 month sentence on defendant Dominic Henley. This opinion sets out my findings of fact on contested factual issues, my conclusions of law regarding the advisory sentencing guidelines, and my rationale for selecting the sentence. My findings are based on the preponderance of the evidence presented at trial and at the sentencing hearing. Except as set forth here, I adopt the findings of fact and legal conclusions set out in the presentence report (PSR). The numbering below corresponds to the paragraph numbers in the objections, and each finding specifies the paragraph number within the PSR to which it refers.

    1.    Paragraph 26 is accurate.

    2.    Paragraph 28 is accurate.

    3.    The last sentence of paragraph 29 is stricken, and the following

sentence is inserted in its place: "*A small percentage of WOS members have achieved 1%er or diamond status, which is a term used to describe members of OMGs who are represented to others as being members who routinely engage in significant criminal activity.*"  Paragraph 29 is otherwise accurate.  The evidence showed that wearing a 1%er or diamond patch was a status symbol conferred more by reason of rank or favor within the organization, than because of proof of actual criminal activity.  The evidence also showed that WOS members intended that 1%er or diamond patches be perceived by others as evidence that the wearer routinely engaged in criminal activity.  Henley was the President of the St. Louis Chapter of the WOS, and he provided directions and orders to other members of the St. Louis Chapter.  On the recordings played at trial, Henley is heard explaining at great length the hierarchy of the WOS organization, and telling other members that they had a duty to provide protection to him and to do whatever he said.

4.     Paragraph 33 is accurate.  The evidence showed that on more than one occasion WOS members, acting at the direction of various WOS officers, assaulted members who had disrespected WOS or who otherwise had not followed the rules.  Henley himself urged that another member be assaulted or otherwise disciplined because Henley believed that member had not adequately protected him during the August 15, 2009 shooting in St. Louis.  Additionally, Henley told that same

member that to earn his WOS colors back he should kill a non-WOS member who was also involved in the shooting.

5. Paragraphs 34 is accurate.

6. Paragraph 35 is accurate. Henley, as St. Louis President, participated in and directed others to carry out the August 10, 2009, armed robbery of a couple who were wearing patches that Henley deemed inappropriate. These victims were not members of any outlaw motorcycle club, but were simply people who rode motorcycles as part of an organized, law-abiding group. Henley ordered his subordinates to take their patches, and he himself approached one of the victims and demanded her vest. When she resisted, co-defendant Timothy Balle pulled a gun and told her to comply with Henley's demand. As Henley had previously instructed Balle that it was his job, as a prospect, to carry a gun, to back up whatever any member said or directed, and to protect Henley because he was the president, it was entirely foreseeable that Balle would pull his weapon and brandish the firearm under these circumstances. After the robbery, Henley directed that another member of the WOS destroy one of the stolen vests so it could not be used as evidence, and the member did so.

7. Paragraph 36 is accurate. Henley argues he should not be held accountable for the August 15, 2009 shooting because the jury acquitted him of

murder (as charged in Count 4) and using a firearm in connection with a crime of violence (as charged in Count 5).  This incident is not used in the guidelines calculations, but it is entirely appropriate that I consider it in sentencing Henley.  He admitted shooting the victim, Kevin Berry, but claimed he did so in self defense.  The self defense instruction was submitted to the jury, and the jury found him not guilty.  But even if this is not technically a homicide, Henley is responsible for Kevin Berry's death.  The evidence showed that Henley had gone to the bar, armed, and engaged in a conversation with others about how the WOS would control the motorcycle set in St. Louis.  He then got into an argument with Kevin Berry, and as the argument escalated, both eventually drew weapons.  Henley admitted that he fired at Berry first, and his bullets were found in Berry's body.  Timothy Balle also shot Berry.  Two witnesses who were involved in the shoot-out – Andre Davis, a friend of Berry's, and Lawrence Pinkston, a WOS member – testified to these events and their testimony was entirely credible.  Berry was killed; Henley and Balle were both shot.  At a later meeting, Henley demanded discipline against Pinkston because, Henley argued, Pinkston had not sufficiently defended him.  At Henley's instigation, Pinkston was beaten and stripped of his WOS colors.  Henley later told Pinkston that if he wanted to get his colors back he would have to kill Andre Davis.

- 4 -

8. The third sentence of Paragraph 37 is amended to strike the phrase "*the distribution of crack cocaine.*" Paragraph 37 is otherwise accurate.

9. This objection relates to Paragraphs 38 through 46. The second sentence of paragraph 38 is amended to omit the phrase "*for the common purpose of raising funds on behalf of WOS.*" Paragraph 38 is otherwise accurate. Paragraphs 39, 40, 42 and 46 are stricken as no evidence was presented at trial on these facts. Paragraphs 41, 43, 44, and 45 are accurate.

10. Paragraph 47 is accurate.

11. Paragraph 48 is accurate.

12. The third sentence of Paragraph 49 is stricken. The fourth sentence is stricken and the following sentence is substituted in its place: "*Henley advised a WOS member who had recently lost his colors that he could earn them back by killing Andre Davis, who was involved in the August 15, 2009 shooting.*" Paragraph 49 is otherwise accurate.

13. Paragraph 50 is accurate.

14. Paragraph 51 is accurate.

15. Paragraph 53 accurately sets out the government's contentions about culpability levels, but the court is not adopting these contentions. It is not necessary for the Court to determine precise culpability levels among the 22

defendants in this case.

16, 20, 24.  <u>Obstruction of Justice</u>:  Paragraph 64 is accurate, and paragraphs 73 and 79 appropriately apply the obstruction of justice enhancement under § 3C1.1.  Defendant committed perjury when he testified at the trial.  Additionally, the obstruction of justice enhancement in Paragraph 73 (Group 1) is also proper because Henley instructed a co-defendant to destroy evidence of the robbery.

19, 23.  <u>Role in the Offense</u>.  Paragraph 72 appropriately applies the two level enhancement under §3B1.1(c) to the robbery.  As President of the St. Louis WOS chapter Henley was a manager or supervisor of the racketeering conspiracy.  He presided at meetings, and directed and supervised at least the conduct of the St. Louis members.  With regard to the armed robbery of the vests, he was directly involved in the armed robbery, and the other WOS members involved were acting in response to his direct orders.  With regard to paragraph 78, however, I do not believe he can be considered a manager or supervisor, because although he was a conspirator in the January 29, 2011 conspiracy to murder members of the OutKast gang (at the Black New Years party in East St. Louis, IL), he acted simply as a participant, and was not directing or managing the others.  The two-level adjustment for his role in the offense under §3B1.1(c) is therefore appropriate in

Paragraph 72 but it is not appropriate in Paragraph 78.

      17, 18, 21, 25, & 26.      <u>Guideline Calculations and Sentence</u>:  Because I sustained the objection to the 2 level enhancement shown in Paragraph 78, the adjusted offense level subtotal in Paragraph 80 changes to 35.  When the multiple count adjustment under § 3D1.4 is applied, the total offense level becomes 36, instead of 38 as shown in Paragraph 87.  Paragraph 120 is amended to read, in its entirety: "**Guideline Provisions:** *Based upon a total offense level of 36 and a criminal history category of I, the guideline imprisonment range is 188-235 months.  As the statutory maximum sentence for Count 13 is 120 months, the guideline range for Count 13 is 120 months.*"

    I sentenced Henley to an aggregate sentence of 204 months, which is close to the middle of the guidelines range of 188-235 months.  I denied the government's motion for an upward departure under § 5K2.1.  The government had requested a sentence of the statutory maximum (which would be 360 months, if the sentences were run consecutively).

    I conclude that the sentence of 204 months is sufficient, but not greater than necessary, to meet the sentencing purposes set out in § 3553(a)(2).  The nature and circumstances of the crime are very serious, and Henley was an officer in a multi-state criminal enterprise.  The recordings of his conversations show that he

considered his role to be very important, and that he took the criminal purposes of the WOS very seriously. He demanded that others provide protection for him, because he was the President; he demanded that others follow certain rules and guidelines, including that they should be armed. He ordered others to rob the "civilians" on August 10, 2009. His actions directly lead to the death of Kevin Berry on August 15, 2009, even if he was not convicted of murder for those actions, and even if he did not set out that night to kill someone. As a leader, he could have defused that situation, but instead he escalated it. He complained to the WOS higher authorities and sought retaliation against a WOS member who, he believed, was insufficiently violent in protecting him. He told that member he could only get his WOS colors back if he killed another person. And he was an active participant in the conspiracy to kill Outkast members at the Black New Year's Party in East St. Louis on January 29, 2011. All these matters indicate that a high sentence is necessary.

On the other hand, Henley has no prior criminal history, he is an educated man, having both a Bachelor's degree and a Masters of Business Administration, and he has always worked, including holding responsible, management-level positions. He has supported his family and has engaged in many charitable and civic activities in the past. The character witnesses he called and the many letters

in support of him that were sent to the court reveal a man who had many friends and options, and his choosing to be involved in this criminal enterprise is hard to understand.  But his involvement was not fleeting or casual – instead he was involved for a lengthy period of time and clearly relished his position of responsibility.  His criminal acts are very serious, and a sentence of 204 months meets the objectives of providing just punishment, deterrence, and incapacitation as required by the statute.

**IT IS HEREBY ORDERED** that the Clerk of Court shall docket this opinion separately in the public file, and shall also attach a copy of it to the Presentence Report that is filed under seal, so that it will accompany the report that is provided to the Bureau of Prisons or is otherwise lawfully disseminated.  The Clerk of Court shall also attach a copy of this Opinion to the sealed Statement of Reasons.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 17th day of April, 2013.